IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

BRENDA DAVIS and
CLARENCE DAVIS,

        Plaintiffs,

v.              CIVIL ACTION NO. 3:18-1415

DISH NETWORK, LLC

        Defendant.

## MEMORANDUM OPINION AND ORDER

Presently pending before the Court is Defendant DISH Network LLC's ("DISH") Motion for Summary Judgment. *Mot. for Summ. J.*, ECF No. 35. Plaintiffs Brenda Davis ("Mrs. Davis") and Clarence Davis ("Mr. Davis") timely filed a Response in Opposition, and Defendant subsequently filed a Reply. *Resp. in Opp'n*, ECF No. 36; *Reply*, ECF No. 37. The Court granted leave for Plaintiffs to file a single-issue Sur-Reply and for Defendant to file a similarly limited Response. *Pl.'s Sur-Reply*, ECF No. 40; *Resp. to Pl.'s Sur-Reply*, ECF No. 46. The issues have been ably briefed and are ripe for review. For the reasons detailed herein, the Court **GRANTS** Defendant's motion.

## I. BACKGROUND

This case originated with Plaintiffs' decision to enter into a two-year television service contract with Defendant on April 12, 2016. *See Def.'s Ex. B*, ECF No 35-2, at 1. Plaintiffs established their account as part of a bundled package with Frontier Communications Corporation ("Frontier"), which also provided Plaintiffs' telephone service. *See Compl.*, ECF No. 1, at ¶ 9. The Digital Home Advantage Plan Agreement ("Plan Agreement") governing Plaintiffs' television

service provided that an early termination fee of $20 per outstanding month would be assessed against their account if the plan were cancelled before the end of the two-year contract. *See Def.'s Ex. B*, at 1. As a routine part of beginning Plaintiffs' television service, Defendant called the Davises a total seven times between April 11, 2016 and April 27, 2016. *Def.'s Ex. A*, ECF No. 35-1, at ¶ 6. Four of these calls were reminders of upcoming service appointments, and three were prompts to complete a technician satisfaction survey. *Def.'s Ex. G*, ECF No 35-7. Defendant avers that it "did not call Plaintiffs after April 27, 2016." *Mot. for Summ. J.*, at 5. While Defendant addresses these calls at length in its motion, Plaintiffs concede they have "made no claims against the Defendant for phone calls placed in 2016."[1] *Resp. in Opp'n*, at 18.

Over the course of the next several months, Plaintiffs "became increasingly dissatisfied with their [television] service and contacted [Defendant] about cancelling their service." *Id.* at 4. When Plaintiffs were informed that cancelling service would result in a substantial early termination fee—calculated using the $20 per month rate contained in their Plan Agreement—they decided instead to enroll in "DISH Pause." *Id.*; *Def.'s Ex. A*, at ¶ 9. As its name suggests, DISH Pause permits a television customer to suspend programming while maintaining an active account with Defendant. *Def.'s Ex. A*, at ¶ 8. To enroll in DISH Pause, customers are required to pay a monthly fee of $5; in exchange, customers continue to possess their equipment and can reactivate their service at a future date. *Id.* Importantly, months spent enrolled in DISH Pause do not count against a customer's term commitment; instead, the term is extended "by the number of days that the service is paused." *Mot. for Summ. J.*, at 5.

---

[1] Given Plaintiffs' concession, the Court will not dwell on these initial calls that occurred at the very beginning of Plaintiffs' relationship with DISH. The Court notes, however, that Plaintiffs' characterization of these calls as a "red herring" overstates the case. *See Resp. in Opp'n*, at 19. Indeed, the evidence suggests these are the only calls for which Defendant possesses any records, and that it sought to address them in its motion in good faith.

Plaintiffs initiated DISH Pause on June 22, 2016, and extended their enrollment in the program on February 15, 2017, and December 19, 2017. *Def.'s Ex. A*, at ¶ 9. Before extending DISH Pause for the second time, a customer service representative cautioned that "five dollars doesn't count those months towards the contract." *Def.'s Ex. H*, ECF No. 35-8, at 13:20–22. While Mrs. Davis expressed some confusion about how DISH Pause related to her term commitment, she nevertheless requested to extend her enrollment in the program. *See id.* All told, Plaintiffs were enrolled in DISH Pause for approximately seventeen months.

On April 17, 2018—two years and five days after beginning service with Defendant—Plaintiffs unbundled and cancelled their satellite television account. *Def.'s Ex. F*, ECF No. 35-6, at ¶ 8. At this point, they also returned their equipment and paid what they believed was their early termination fee. *Def.'s Ex. A,* at ¶ 11; *Compl.*, at ¶ 14. In reality, their payment of $279.99 was the final bundled monthly bill from Frontier and was comprised of $51.98 in internet charges, $14.30 in satellite television charges, $227.21 in charges from a previous bill, and $4.50 in convenience fees. *Def.'s Ex. F,* ¶ 7.

Although Plaintiffs contend they misunderstood the mechanics of DISH Pause and believed the $279.99 payment represented their early termination fee, the factual record up to this point is relatively undisputed. Nevertheless, the parties' stories begin to diverge in late April 2019. Plaintiffs' early termination bill arrived on April 21, 2019, correctly calculated at $360.40 pursuant to the Plan Agreement's $20 per month fee provision and applicable taxes and fees.[2] *Def.'s Ex. A*, at ¶ 12; *Def.'s Ex. I*, ECF No. 35-9. On May 21, 2019, second copy of the early termination bill

---

[2] Plaintiff questions how the early termination fee was reached and wonders "Was the $360.40 figure, even correct?" *Resp. in Opp'n*, at 17. As the bill and basic arithmetic demonstrate, this total is the product of the $20.00 per month early termination fee multiplied by seventeen months, plus $20.40 in state and local taxes. *See Def.'s Ex. I*, at 2, 4.

arrived from DISH seeking the same amount. *Def.'s Ex. I*. On June 6, 2018, an independent third-party debt collector and attorney—Richard Maury Cobb ("Cobb")—sent Plaintiffs a collection letter mistakenly seeking payment of $720.80 towards their DISH account. *Compl.*, at ¶¶ 21–22; *Def.'s Ex. K*, ECF No. 35-11. While Plaintiffs argue in their response that Cobb was acting as Defendant's agent in seeking to collect an ever-ballooning debt with no legitimate foundation, Defendants claim the amount contained in the letter was Cobb's sole error and that "[a]n independent third-party vendor whom DISH contracted to collect delinquent accounts independently hired Maury Cobb." *Resp. in Opp'n*, at 8; *Def.'s Ex. O*, ECF No 37-3, at ¶ 4.

Around this same time, Plaintiffs allege they "received numerous phone calls from [Defendant], to their cellular phones, after revoking their consent to Defendant's calls numerous times, during phone calls from Defendant." *Compl.*, at ¶ 23. Plaintiffs claim these calls were made using automatic telephone dialing systems,[3] and that they came from a variety of numbers. *Id.* at ¶ 24; *Resp. in Opp'n*, at 18; *Pl.'s Ex. 4*, ECF No. 36-4, at 18. Plaintiffs single out the number (877) 839-0927, which they contend Defendant used to call their cell phones during April and May 2018.[4] *Compl.*, at ¶¶ 26–30; *Pl.'s Ex. 4,* ECF No. 36-4, at 18. Defendant strongly disagrees with these allegations, disclaiming any ownership of the (877) 839-0927 telephone number and stating unequivocally that "DISH made its last telephone call to the [Plaintiffs'] number on April 27, 2016."[5] *Def.'s Ex. A*, at ¶ 7.

---

[3] Plaintiffs provide no support for this assertion.
[4] The exact number of these calls is unclear; while Mrs. Davis suggests that she received twenty-five to thirty calls from the (877) 839-0927 number, the phone records Plaintiffs provide reveal only fifteen calls. *See Pl.'s Ex. 4,* ECF No. 36-4, at 18 (recalling twenty-five to thirty calls from DISH in 2018); *Pl's Ex. 8*, ECF No. 36-10 (recording fifteen calls from the (877) 839-0927 number).
[5] Though discussed at length *infra*, the Court is compelled to address Plaintiffs' characterization of Defendant's inability to provide any telephone records from 2018 as something approaching fraud. *See Resp. in Opp'n*, at 18 (arguing that "Defendant has failed to produce its

On July 5, 2018, Plaintiffs' counsel sent Right to Cure Notices to Defendant and Cobb. *Compl.*, at ¶ 34. Defendant responded on July 20, 2018, informing Plaintiffs that it had been seeking to collect an early termination fee but that it would cease collection of the debt in the future. *Id.* at ¶ 36. In July 2018, Defendant refunded $6.67 in previously-billed DISH Pause payments.[6] *Reply*, at 10. "This response did not address [their] concerns," so Plaintiffs initiated the instant action on November 8, 2018. *See Compl.*, at 5. Though both DISH and Cobb were originally named as defendants, Plaintiffs settled with Cobb on December 18, 2018 and released their claims against him in connection with the debt collection letter.[7] *Def.'s Ex. E*, at 37. On August 5, 2019, the Court granted Defendant's Motion for Partial Summary Judgment with respect to Count V of Plaintiffs' complaint, reasoning that the Telephone Harassment Act is a criminal statue without a private cause of action. *See Order*, ECF No. 34. Defendant filed the instant Motion for Summary Judgment on September 3, 2019, and asks this Court to dismiss all remaining counts.

## II. LEGAL STANDARD

A court will "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

call records for . . . anytime in 2018"). If Plaintiffs mean to contend that Defendant is somehow concealing discoverable information, they should put the issue squarely before the Court and support their allegations with evidence. Barring such a showing, however, the Court does not welcome oblique references to a party's "failure" to produce relevant information where there is no indication that it possessed the information being sought in the first place.

[6] Plaintiffs also reference a refund check from August 2018 in the amount of $6.56, but go on to specifically reproduce a copy of the July 26, 2018 refund check for $6.67 in their Response. *Compare Resp. in Opp'n*, at 5 ("In or around August of 2018, the Plaintiffs received a refund check from [Defendant] in the amount of $6.56) *with id.* at 6 ("[Defendant] refunded the Plaintiff $6.67 in July of 2018."). While immaterial to Defendant's Motion for Summary Judgment, the Court notes its assumption that these discrepancies in the precise date and amount of Plaintiffs' refund check is a simple error on Plaintiffs' part.

[7] As Plaintiffs' Fair Debt Collections Practices Act claim contained in Count III of the Complaint was only asserted against Cobb, it is not implicated in the instant Motion for Summary Judgment.

56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). "The moving party is 'entitled to judgment as a matter of law' when the nonmoving party fails to make an adequate showing on an essential element for which it has the burden of proof at trial." *Id.* (citing *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 804 (1999)).

In considering a motion for summary judgment, the Court will not act as a jury. It will not "weigh the evidence and determine the truth of the matter," nor will it make determinations of credibility. *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 249 (1986); *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991). Instead, at the summary judgment stage "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (internal quotations omitted). Nevertheless, such inferences "must fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Moreover, the nonmoving party "may not rely merely on allegations or denials in its own pleading" but must instead "set out specific facts showing a genuine issue for trial." *The News & Observer Publ'g Co.*, 597 F.3d at 576 (quoting Fed. R. Civ. P. 56(e)). These facts must offer "concrete evidence from which a reasonable juror could return a verdict in" the nonmoving party's favor. *Anderson*, 447 U.S. at 252. Indeed, "[m]ere speculation by the non-movant cannot create a genuine issue of material fact" sufficient for a nonmoving party to overcome its burden. *JKC Holding Co.*, 264 F.3d at 465. Put simply: a "scintilla of evidence," without any other support, is not enough to survive a motion for summary judgment. *Anderson*, 447 U.S. at 252.

## III. DISCUSSION

Defendant moves for summary judgment on each of the six remaining counts of Plaintiffs' Complaint. Count I alleges a violation of the federal Telephone Consumer Protection Act ("TCPA"). Count II concerns violations of the West Virginia Consumer Credit and Protection Act ("WVCCPA"). Count IV claims that Defendant violated the West Virginia Computer Crimes and Abuse Act ("WVCCAA"). Counts VI, VII, and VII are common-law tort claims grounded in negligence, intentional infliction of emotional distress, and invasion of privacy, respectively.

Rather than proceed directly through an analysis of each count, the Court will first undertake a review of exactly which communications remain at issue. As noted *supra*, Plaintiffs do not contest Defendant's seven calls from 2016. *Resp. in Opp'n*, at 18. This leaves three potential categories of communication in dispute: two early termination bills from DISH, the Maury Cobb collection letter, and a set of phone calls from (877) 839-0927. This third category warrants the Court's immediate attention, given its centrality to the bulk of Plaintiffs' claims and the volume of argument that has surrounded it.

### A. The (877) 839-0927 Number

The parties' dispute over the (877) 839-0927 number is straightforward. Plaintiffs claim that Defendant utilized the telephone number (877) 839-0927 to place a number of calls to their mobile phones in April and May of 2018. *Resp. in Opp'n*, at 3. Defendant argues that it did not make any calls to Plaintiffs after 2016, and has never owned or made phone calls from the (877) 839-0927 number. *Resp. to Pl.'s Sur-Reply*, at 1. On its face, such a dispute would seem to represent a genuine issue of material fact. A closer examination of the evidence, however, reveals just the opposite.

As a preliminary matter, the Court acknowledges that Defendant bears the burden of establishing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Yet once Defendant has met this burden, it falls to Plaintiffs "to produce sufficient evidence for a jury to return a verdict" in their favor. *Howell v. Bluefield Reg'l Med. Center*, No. 1:07-0112, 2008 WL 2543448, at *2 (S.D.W. Va. June 23, 2008). In doing so, the "mere existence of a scintilla of evidence in support of [Plaintiffs'] position will be insufficient" to avoid summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Instead, the evidence must be concrete and of the sort that could persuade a reasonable juror to return a verdict in Plaintiffs' favor. *Id.* at 256.

With these standards in mind, Plaintiffs' failure to demonstrate the existence of a genuine issue of a material fact is made plain. Plaintiffs have alleged that "Defendant has failed to produce its call records for . . . anytime in 2018," specifically referencing the calls Mrs. Davis received from the (877) 839-0927 number.[8] *Resp. in Opp'n*, at 18. Defendant countered with an affidavit disclaiming ownership of the (877) 839-0927 number. *See Def.'s Ex. N*, ECF No. 37-2. Faced with allegations on the one hand and evidence on the other, Defendant succeeded in establishing that it did not own or control the (877) 839-0927 number. Nevertheless, because this evidence was not provided in Defendant's original Motion for Summary Judgment, the Court granted leave for Plaintiffs to file a sur-reply memorandum "addressing the ownership of the [(877) 839-0927] number, along with any *authenticated evidence tending to demonstrate Defendant's association*

---

[8] Plaintiffs take a further—and entirely speculative—step in suggesting that "the number of calls Plaintiff actually received may far exceed those listed on her phone records" because "Plaintiff was informed by AT&T that incoming calls must last at least one minute before they will appear on the AT&T phone records." *Resp. in Opp'n*, at 18. Setting aside the many evidentiary issues associated with Plaintiffs' phone records and the alleged statement by AT&T, Plaintiffs offer no support whatsoever for this unsubstantiated hypothetical and do not even attempt to isolate a particular number of calls.

*with it.*" *Order*, ECF No. 39, at 2 (emphasis added). Instead, Plaintiffs replied with a memorandum and three exhibits: an affidavit by Mrs. Davis recalling her interactions with individuals on the (877) 839-0927 number, the same inadmissible[9] call records provided in Plaintiffs' original Response, and Plaintiffs' DISH account records.

Plaintiffs draw upon this limited evidence to advance two basic lines of argument to establish Defendant's ownership of the (877) 839-0927 number: first, that individuals associated with DISH are on the other end of the line for outgoing and incoming calls, and second, that three entries in their account records correspond temporally with phone calls from the (877) 839-0927 number. In analyzing the sufficiency of these arguments, the Court asks whether they could persuade a reasonable juror to return a verdict in Plaintiffs' favor. *See Anderson*, 477 U.S. at 256. Here, the simple answer is that they cannot.

With respect to Plaintiffs' first attempt to demonstrate the existence of a triable issue of fact, the Court notes that "conclusory statements with no evidentiary basis cannot . . . defeat a motion for summary judgment." *Penn v. Citizens Telecom Services Co., LLC*, 999 F. Supp. 2d 888, 895 (S.D.W. Va. Feb. 26, 2014). Mrs. Davis claims she received numerous telephone calls from the (877) 839-0927 number over the course of April and May 2018, and that "the person on the

---

[9] Rule 56(c)(2) of the Federal Rules of Civil Procedure provides that a "party may object that . . . material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Here, Defendant correctly argues that the phone call log provided by Plaintiffs is unauthenticated and therefore inadmissible. While records kept in the course of a regularly conducted business activity are admissible as an exception to the rule against hearsay under Rule 803(6)(B) of the Federal Rules of Evidence, such records must be authenticated by a "custodian or another qualified witness." Fed. R. Evid. 803(6)(D). Plaintiffs have provided no such authenticating testimony here, despite the Court's prior admonition that Plaintiff's Sur-Reply be supported with "any *authenticated* evidence tending to demonstrate Defendant's association with the" (877) 839-0927 number. *Order*, ECF No. 39, at 2 (emphasis added). As "hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment," *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246 (4th Cir. 1991), the Court is unable to consider the phone call log that Plaintiffs have submitted here.

other end of the line stated that they were calling from D[ISH]." *Pl.'s Ex. A*, ECF No. 40-1. She also references an October 4, 2019 call to the (877) 839-0927 number, wherein "a woman answered the phone and stated 'Thank you for calling in regards to your D[ISH] account.'" *Id.* Based on these interactions, Plaintiffs conclude "there can be no doubt that the telephone number [(877) 839-0927] is a telephone number used both in the past and currently used by the Defendant." *Id.* at 2. On the contrary, this evidence leaves quite a bit of room for doubt. Even if the individuals who spoke with Plaintiffs on the (877) 839-0927 number stated that they were calling on behalf of DISH, their statements do not prove that they actually *were* DISH agents or employees.

Plaintiffs' second argument—that entries in their DISH account record correspond with three calls on their AT&T phone records—is likewise insufficient to create a genuine issue of material fact. The Court's reasoning on this point is uncomplicated, as the AT&T phone records themselves are unauthenticated and inadmissible and therefore cannot be considered at the summary judgment stage.[10] What remains is a DISH account record that is predominately comprised of notes entirely unrelated to Plaintiffs' lawsuit. Those that Plaintiffs point to in

---

[10] Even if the AT&T phone records were admissible, Plaintiffs would be unable to demonstrate the existence of a genuine dispute of material fact. Plaintiffs point to three calls in particular: (1) a call on Tuesday, May 22, 2018 at 8:58 a.m. EDT, (2) a call on Thursday, May 24, 2018 at 10:59 a.m. EDT, and (3) a call on Friday, May 25, 2018 at 10:49 a.m. EDT. *Pl.'s Sur-Reply*, at 2. Plaintiffs argue that these calls correspond with entries in their DISH account records, provided as part of discovery approximately seven months ago: (1) an entry on Tuesday, May 22, 2018 at 7:00 a.m. MDT, (2) an entry on Thursday, May 24, 2018 at 9:03 a.m. MDT, and (3) an entry on Friday, May 25, 2018 at 8:52 a.m. MDT. *Id.* Plaintiffs argue that each of these entries appear to be notes taken "during or directly after a phone call with" Mrs. Davis. *Id.* As a preliminary matter, Plaintiffs incorrectly characterize the May 22 call as "incoming"; if Plaintiffs' own unauthenticated phone records are to be believed, *they* called the (877) 839-0927 number on May 22. Moreover, Plaintiffs cannot create a genuine issue of material fact by pointing to two incoming phone calls over the course of a month that "appear" to correspond with notes "taken during or after a phone call with" Mrs. Davis. *Id.* Inasmuch as "mere speculation by the non-movant" is not enough to establish the existence of a genuine dispute of material fact, Plaintiffs' conjecture as to the timing of entries in their DISH account records is insufficient to avoid summary judgment. *JKC Holding Co.*, 264 F.3d at 465.

particular are difficult to decipher and do not suggest any relationship with the (877) 839-0927 number. At 7:00 a.m. MDT on May 22, 2018, a note appears on Plaintiffs' DISH account record stating "ACCT IS IN 1ST PARTY COLLECTIONS CUST STATES that THIS BILL HAS ALREADY BEEN TAKEN CARE OF ADVISED IT IS STILL SHOWING A BALANCE TRANSFERRED TO LTY." *Pl.'s Ex. C*, ECF No 40-1, at 18. At 9:03 a.m. MDT on May 24, 2018, another note reads "CUST DISPUTING CHARGES." *Id.* Finally, at 8:52 a.m. MDT on May 25, 2018, an account note reads "ALTERNATE PHONE NUMBER CHANGED OLD NUMBER: 999999999." *Id.* As is evident, these account notes have little—if any—independent meaning, and nothing they contain ties Defendant to the (877) 839-0927 number.[11]

"Mere speculation by the non-movant cannot create a genuine issue of material fact" to avoid summary judgment, *JKC Holding Co.*, 264 F.3d at 465, and Plaintiffs' conjecture as to the ownership of the (877) 839-0927 number is exactly that. The Court is not confronted with a war of unsupported allegations on both sides, but rather a situation where Defendant has provided evidence that it does not own or make calls from the (877) 839-0927 number and Plaintiff has responded with plainly insufficient evidence to counter that fact. *See Pugliese v. Prof'l Recovery Serv., Inc.*, No. 09-12262, 2010 WL 2632562, at *6 (E.D. Mich. June 29, 2010) (reasoning in similar circumstances that "Plaintiffs have failed to subpoena data regarding the ownership of this number and provide no evidence that Defendants own or control this number," and thus could not

---

[11] The Court notes that the May 22, 2018 entry in the DISH account records references the fact that Plaintiffs' account was "in 1st Party Collections." *Pl.'s Ex. C*, ECF No 40-1, at 18. Defendant avers that these account notes were produced "in discovery seven months ago." *Def.'s Rep. to Sur-Reply*, at 2. That Plaintiffs apparently took no action during discovery to identify this potential third-party defendant represents a significant oversight. Even more notably, Defendant represents that Plaintiffs "did not ask a single written discovery request as to the [(877) 839-0927 number] or take a single deposition." *Id.* This Court's role is not to rescue Plaintiffs from their own disadvantageous decision-making during discovery, but is nevertheless compelled to note how these decisions have compounded up to this point.

"create a genuine issue of material fact by simply asserting conclusory statements that the Defendants could possibly control this number"). The crux of the matter is this: Plaintiffs may well have received a series of calls during April and May of 2018 from callers claiming an association with Defendant, but they have presented no evidence that would allow this Court to conclude that Defendant was actually responsible for the calls. Even after a lengthy period of discovery and the opportunity to depose witnesses to learn the identity of the party responsible for the calls, Plaintiffs have offered the court nothing more than speculation that Defendant is somehow associated with the number. Absent further indicia of Defendant's ownership or control of the (877) 839-0927 number, no reasonable juror could conclude that Plaintiffs' conjecture and guesswork is sufficient to sustain any claims based on those calls.

### B. Counts I, IV, and VIII

As Plaintiffs do not base claims on the seven 2016 phone calls that Defendant has identified and have failed to meet their burden with respect to any 2018 phone calls, no disputes over telephone calls are still present in this action. As such, summary judgment is warranted as a preliminary matter on Counts I, IV, and VIII of Plaintiffs' Complaint. Count I is based on the TCPA, which makes it unlawful to place "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to . . . a cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii). As no telephone calls remain in dispute, no reasonable juror could return a verdict for Plaintiffs on this claim.

The same logic applies to Count IV of Plaintiffs' Complaint, which is based on the WVCCAA. A criminal statute providing, in part, that "[i]t is unlawful for any person, with the intent to harass or abuse another person, to use a computer, mobile phone, personal digital assistant

or other electronic communication device to . . . make contact with a person after being requested by the person to desist from contacting them," W. Va. Code. § 61-3C-14a(a)(2), the WVCCAA also provides a private cause of action for compensatory and punitive damages, *id.* at § 61-3C-16(a). As telephone calls were the only form of electronic communication that Plaintiffs implicated in their suit, this claim cannot survive summary judgment.

Finally, Count VIII of Plaintiffs' Complaint is a common-law invasion of privacy claim. An individual's right to privacy is well-established under West Virginia law. *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 84 (W. Va. 1983). This right extends to "the right of an individual to be let alone and to keep secret his private communications, conversations and affairs," and its "unwarranted invasion or violation . . . gives rise to a common-law right of action for damages." *Id.* (quoting *Roach v. Harper*, 105 S.E.2d 564 (W. Va. 1958)). Plaintiffs raise their invasion of privacy claim based on the phone calls they allegedly received in 2018. It is true enough that repeated and harassing phone calls may be enough to support an invasion of privacy claim. *See*, *e.g.*, *Imagine Medispa, LLC v. Transformations, Inc.*, 999 F. Supp. 2d 873, 886 (S.D.W. Va. 2014). Of course, as no phone calls remain at issue here, summary judgment is also warranted with respect to Plaintiffs' invasion of privacy claim. What remains are two common-law claims and one statutory claim, all of which are based on just two categories of written communication: two early cancellation bills from DISH, and a single debt collection letter from Maury Cobb.

### C. Count II: The West Virginia Consumer Credit and Protection Act

Plaintiffs base the second count of their complaint on the WVCCPA, "a comprehensive consumer protection law that incorporates elements of the Uniform Consumer Credit Code, the National Consumer Act, and older West Virginia Statutes." *Bourne v. Mapother & Mapother, P.S.C.*, 998 F. Supp. 2d 495, 500 (S.D.W. Va. 2014) (internal quotations omitted). "The purpose

of the [WVCCPA] is to protect consumers from unfair, illegal, and deceptive acts or practices by providing an avenue of relief for consumers who would otherwise have difficulty proving their case under a more traditional cause of action," *State ex. Rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 461 S.E.2d 516, 523 (W. Va. 1995) (internal quotations omitted), and "is to be given a broad and liberal construction," *Bourne*, 998 F. Supp. 2d at 500.

Plaintiffs lay out their claim under four specific provisions of the WVCCPA. *Compl.*, at ¶ 48. First, they allege that Defendant used "unfair or unconscionable means to collect or attempt to collect any claim in violation of . . . [section] 46A-2-127(d)." *Id.* Second, they argue Defendant employed "unfair or deceptive acts or practices in the conduct of . . . trade or commerce, in violation of . . . [section] 46A-6-104." *Id.* Third, they contend that Defendant unreasonably oppressed them through the use of profane or obscene language and engaging them in telephone conversation with the intent to annoy, abuse, or threaten them, in violation of section 46A-2-125. *Id.* Fourth and finally, Plaintiffs argue that Defendant used threats and coercion in its attempt to collect its debt, in violation of section 46A-2-124. *Id.* Defendant disagrees, arguing that no communication at issue here even approaches a violation of the WVCCPA.

The Court will begin its analysis by noting that the early termination bills from DISH do not violate any of the above-cited provisions of the WVCCPA. *See Def.'s Ex. I,* ECF No. 35-9. The bills themselves are fairly typical, outlining outstanding payment obligations and providing other information about Plaintiffs' account. Plaintiffs cite no authority—nor can they—for the proposition that two legitimate bills like these constitute a violation of the WVCCPA. Specifically, they cannot demonstrate that the bills represent an "unfair or unconscionable means" of collecting an unpaid debt in violation of section 46A-2-127(d); to hold otherwise would render the collection of virtually *any* debt a violation of the WVCCPA. Defendant similarly employed no "false

representation" in attempting to collect its early termination fee, *see* W. Va. Code § 46A-2-127(d), nor did it attempt to collect a fee in excess of what is provided for in Plaintiffs' Plan Agreement, *see* W. Va. Code § 46A-2-128(d). Likewise, sending bills like those at issue here is hardly an "unfair or deceptive" act or practice that would violate section 46A6-104. With respect to section 46A-2-125, the Court has already determined that no telephone calls remain in dispute. Finally, the bills plainly employ no threats or coercion that would violate section 46A-2-124. In short, while the "WVCCPA bars certain abusive behaviors by debt collectors, it does not bar any attempt to collect a legitimate debt." *Perez v. Figi's Companies, Inc.*, No. 5:15-cv-13559, 2017 WL 1591894, at *3 (S.D.W. Va. Apr. 28, 2017). Summary judgment is therefore warranted with respect to DISH's early termination bills.

The Court's analysis of the Maury Cobb letter under the WVCCPA turns on a different issue altogether. While Plaintiffs argue extensively that the "law of agency . . . applies to the relationship between [DISH] and its attorney, Maury Cobb," *Resp. in Opp'n*, at 8, Defendant correctly points out that Plaintiffs fail to plead any facts sufficient to suggest—let alone establish—the existence of an agency relationship between DISH and Cobb that would give rise to vicarious liability. Indeed, the evidence suggests that the opposite is true. In an affidavit, Cobb avers that "DISH . . . does not, and cannot, control the manner and means in which Maury Cobb conducts its debt collection business." *Def.'s Ex. O*, ECF No. 37-3, at ¶ 2. Cobb further states that "[a]t no point did DISH hire Maury Cobb," and that an "independent third-party vendor with whom DISH contracted to collect delinquent accounts independently hired Maury Cobb." *Id.* at ¶ 4. Cobb also notes that he sent his collection letter to Plaintiffs "on [his] own accord and without instruction from DISH." *Id.* at ¶ 5. As Cobb has already settled with Plaintiffs, the question before the Court is whether vicarious liability for his letter applies against Defendant. The answer, as the above

evidence suggests, is that it does not. As this Court has reasoned on prior occasions, "[o]ne of the essential elements of an agency relationship is the existence of some degree of control by the principal over the conduct and activities of the agent." *Johnson v. New River Scenic Whitewater Tours, Inc.*, 313 F. Supp. 2d 621, 633–34 (S.D.W. Va. 2004). Plaintiffs have not pleaded any facts that suggest Defendant controlled Cobb's actions; indeed, they have not pleaded any facts suggesting that Defendant even *hired* Cobb.[12] Under West Virginia law, "[i]t is always incumbent upon one who asserts vicarious liability to make a prima facie showing of the existence of the relation of . . . principal and agent." *Sanders v. Georgia-Pac. Corp.*, 225 S.E.2d 218, 222 (W. Va. 1976). As Plaintiffs have failed to make this showing, no reasonable juror could determine that Defendant is vicariously liable for Cobb's letter.

**D. Count VI: Negligence**

The Court turns next to Plaintiffs' negligence claim, which is based specifically upon Defendant's alleged failure "to train, supervise, monitor, or otherwise control its employees to ensure that [they] did not violate" the federal and state statute statues noted above. *Compl.*, at ¶¶ 64–69. While Plaintiffs plead the core elements of a negligence claim—duty, breach, causation, and damages—they provide little additional elaboration, and generally rely on conclusory assertions related to Defendant's failure to train its employees. *Id.* Yet even these formulaic allegations neglect to plead a crucial element of a negligent training and supervision claim: an underlying negligent act on the part of an employee.

Under West Virginia law, claims for negligent training or supervision cannot succeed absent an underlying claim for employee negligence. *See Heslep v. Ams. for African Adoption,*

---

[12] To mask this shortcoming, Plaintiffs draw extensively upon the Restatement (Third) of Agency without applying any of their quoted law to the case at hand. *Resp. in Opp'n*, at 8–11.

*Inc.*, 890 F. Supp. 2d 671, 687 (N.D.W. Va. 2012). "If a complaint fails to identify and employee's negligent act, the claim for negligent training or supervision should be dismissed as a matter of law." *Carroll v. USAA Sav. Bank*, No. 3:16-11120, 2017 WL 811491, at *3 (S.D.W. Va. Mar. 1, 2017). In the instant case, Plaintiffs do not allege any negligent act in their Complaint and have not pointed to one at any other point since the initiation of this action. The closest they come to doing so is suggesting that Defendant's negligent training led to its employees' violation of the WVCCPA and TCPA, but the Court has already established that both these statutory claims must fail as a matter of law. Against this backdrop, Defendant argues that Plaintiffs' negligence claim must similarly fail. Once again, the Court agrees. Plaintiffs simply fail to present any evidence to suggest that Defendant's employees breached a duty of care with respect to its April 21, 2018 bill or the Maury Cobb letter. Given this meager showing, no reasonable juror could return a verdict for Plaintiffs on their negligence claim.

### E. Count VII: Intentional Infliction of Emotional Distress

Plaintiffs' final remaining count alleges a claim of intentional infliction of emotional distress ("IIED"). To maintain an IIED claim under West Virginia law, a plaintiff must demonstrate that

> (1) The defendant's conduct was atrocious, intolerable, and *so extreme and outrageous as to exceed the bounds of decency*; (2) the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from its conduct; (3) the actions of the defendant caused the plaintiff to suffer emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Travis v. Alcon Labs, Inc.*, 504 S.E.2d 419, 425 (W. Va. 1998) (emphasis added). "The extreme and outrageous requirement is a notoriously high burden to meet." *Bourne*, 998 F. Supp. 2d at 507. "It is not enough that an actor act with tortious or even criminal intent." *Id.* Instead, the actions in

question "must be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting *Tanner v. Rite Aid of West Virginia, Inc.*, 461 S.E.2d 149, 157 (W. Va. 1995)).

Here, Defendant argues that Plaintiffs have failed to meet this high burden. They argue that "[e]ven in more serious cases of claimed misconduct, an IIED claim fails." *Mot. for Summ. J.*, at 18. The Court agrees. "West Virginia courts do not whimsically apply the legal standards for IIED," and must serve as gate-keepers for IIED claims. *O'Dell v. USAA Fed. Sav. Bank*, No. 3:17-1427, 2018 WL 1701973, at *11 (S.D.W. Va. Apr. 5, 2018) (citing *Philyaw v. E. Associated Coal Corp.*, 633 S.E.2d 8, 14 (W. Va. 2016)). Here, Plaintiffs allege that the April 21, 2018 DISH bill and Maury Cobb collection letter meet the threshold for IIED. These facts, however, are plainly not so atrocious that they are "utterly intolerable in a civilized community." *Bourne*, 998 F. Supp. 2d at 507. This Court's prior analyses in similar cases are instructive. For example, in *O'Dell v. USAA Federal Savings Bank*, 2018 WL 1701973, at *11, this Court concluded that a plaintiff who had received 183 collection phone calls over a four-month period had not raised an IIED claim capable of surviving a motion for summary judgment. While it is entirely possible that Plaintiffs were annoyed by the DISH bills and collection letter and were possibly confused by the different amounts listed on both sets of documents, it would defy reality to conclude that the receipt of three pieces of mail over a nearly two-month period exceeds all possible bounds of decency. *See Travis*, 504 S.E.2d at 425. Given this significant evidentiary deficit, the Court concludes that no reasonable juror could find for Plaintiffs on their IIED claim. Accordingly, Defendant is entitled to summary judgment with respect to Count VII of Plaintiffs' Complaint.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment, ECF No. 35, is **GRANTED.**

The Court **DIRECTS** the Clerk to forward copies of this written opinion and order to all counsel of record and any unrepresented parties.

ENTER: October 22, 2019

_____
ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE